Robert Tauler (SBN 241964)
Tauler Smith LLP
11111 Santa Monica Blvd., Suite 500
Los Angeles, California 90025
Telephone: (310) 746-5601
rtauler@taulersmith.com

Attorneys for Plaintiff
NUTRITION DISTRIBUTION LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NUTRITION DISTRIBUTION LLC, an Arizona Limited Liability Company, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **1) UNFAIR COMPETITION (Bus. & Prof. Code  § 17200, *et seq.*)** |
| FURIOUS NUTRITION, LLC, a Texas Limited Liability Company; DNA ANABOLICS, LLC, a Texas Limited Liability Company; DNA DISTRIBUTION, LLC, a Texas Limited Liability Company; LEGACY SERIES SUPPLEMENTS, LLC, a Texas Limited Liability Company; JOSEPH ALIPERTO, an individual; DUSTY MASON, an individual; JASEIL GOSAI, an individual; ALEXY GOLDSTEIN, an individual; and DOES 1 through 10, inclusive, | **2) FALSE ADVERTISING (Bus. & Prof. Code  § 17500, *et seq.*)**<br><br><br>**DEMAND FOR A JURY TRIAL** |
| Defendants. | |

Plaintiff Nutrition Distribution, LLC, dba Athletic Xtreme ("ND" or "Plaintiff"), by and through its undersigned attorneys, submits this Complaint against Defendant Furious Nutrition LLC ("FN"), DNA Anabolics, LLC ("DNA"), DNA Distribution, LLC, Legacy Series Supplements, LLC, Joseph Aliperto, Dusty Mason, Jaisel Gosai, and Alexy Goldstein (collectively "Defendants"), and in support thereof, avers as follows:

## INTRODUCTION

1. Defendants have conspired to manufacture, distribute and sell illegal steroids across state lines.  Some of the drugs have been marketed and falsely advertised as "dietary supplements," while others have brazenly been sold by their chemical compound name, despite the fact that the products are illegal to sell over the counter.

2. A prime example is Defendants false and misleading advertising regarding its product "Ostarine" (the "Ostarine Product").  The active ingredient in FN's Ostarine Product is Ostarine – a "Selective Androgen Receptor Modulator" ("SARM").  SARMs, like Defendant's Ostarine Product, are synthetic drugs with similar effects to illegal anabolic steroids.  Defendants have misbranded its Ostarine Product as "intended for laboratory and research use only" and "NOT FOR HUMAN CONSUMPTION," while simultaneously advertising and selling its product as a new miracle body building "drug" and "dietary supplement."

3. This action seeks to enjoin Defendants from the marketing and sale of products containing Ostarine and/or other SARMS, as Defendant is illegally and falsely marketing such products in violation of the Lanham Act and the California Unfair Competition Law and False Advertising Law (Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq*.).

4. Defendant's false, misleading, illegal and deceptive practices have unjustly enriched Defendant at the expense of Plaintiff, and have caused Plaintiff extensive and irreparable harm, including, but not limited to, loss of revenue, disparagement, and loss of goodwill.

**JURISDICTION AND VENUE**

5.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. 1332 (diversity jurisdiction) because Plaintiff asserts causes of action arising under federal law and the parties are citizens of different states and the controversy exceeds the value of $75,000.

6.     This Court has personal jurisdiction over Defendants because Defendants have, directly or through their intermediaries (including distributors, retailers, and others), developed, licensed, manufactured, shipped, distributed, offered for sale, sold, and advertised its nutritional supplement products in the United States, the State of California, and this district, including the products listed above.  Defendants have purposefully and voluntarily placed its supplements and misbranded drugs into the stream of commerce with the expectation that they will be purchased in this district.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions which gave rise to the claim occurred in this district.  *Allstar Marketing Group, LLC v. Your Store Online*, LLC, 666 F. Supp. 2d 1109, 1128 (C.D. Cal. 2009). Alternatively, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3).

**PARTIES**

8.     Plaintiff Nutrition Distribution, LLC, dba Athletic Xtreme ("ND" or "Plaintiff") is an Arizona limited liability company with its principal place of business at 14215 N. 8th Pl., Phoenix, Arizona, 85022.

9.     Defendant Furious Nutrition ("FN") is a Texas Limited Liability company.

10.     Defendant DNA Anabolics ("DNA") is a Texas Limited Liability company.

11.     Defendant DNA Distribution, LLC ("DNA Distribution") is a Texas Limited Liability company.

///

12.     Defendant Legacy Series Supplements, LLC ("Legacy") is a Texas Limited Liability company.

13.     Defendant Joseph Aliperto ("Aliperto") is a resident of Minnesota.  Aliperto is a managing member of Defendant FN and a manager of Defendant DNA.

14.     Defendant Dusty Mason ("Mason") is a resident of Texas.  Mason is a managing member of Defendant FN and a manager of Defendant DNA.

15.     Defendant Jaisel Gosai ("Gosai") is a resident of Florida and a manager of Defendant DNA.

16.     Defendant Alexy Goldstein ("Goldstein") is a resident of California and a manager of Defendant DNA.

17.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and therefore sued these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

## FACTUAL ALLEGATIONS

18.     The nutritional supplement industry is one of the fastest growing and most lucrative in the United States.  A recent Forbes article estimates that nutritional supplement sales accounted for $32 billion in revenue in 2012 and predicts this number to grow to $60 billion within ten years.  The growth and size of the nutritional supplement market and the relatively low barriers to entry provide perverse incentives for unfair competition prohibited by the Lanham Act and the California Unfair Competition Law and False Advertising Law (Business and Professions Code §§ 17200 and 17500, *et seq.*) and other illegal activity.

///

**Plaintiff Nutrition Distribution**

19.     Plaintiff is a cutting edge sports supplement manufacturer and marketer. From its inception, Plaintiff was a leader in the nutritional supplement market, specifically for bodybuilding.

20.     Plaintiff has products in several categories of body building products, including pre-workouts and muscle enhancement.

21.     After devoting its resources for over a year on product development and testing, Plaintiff introduced their formulations of "Advanced PCT" & "Ultra Reps" in July 2009 and January 2012, respectively.  Advanced PCT is a natural nutritional supplement that is designed to boost testosterone.  Ultra Reps helps promote longer workouts by fighting muscle fatigue and burn.  Advanced PCT & Ultra Reps are still in the market today and directly compete with Defendants' products.

**Defendant Furious Nutrition And Its Ostarine Products**

22.     Defendant FN is a competing nutritional supplement company in Texas.

23.     According to Defendant's representations on its website and otherwise, the active ingredient in its Ostarine Product is a pharmaceutical ingredient known as Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide).

24.     On its website and through other promotional materials, Defendant touts numerous purported benefits of its Ostarine Product.  For example and without limitation, Defendant claims that its Ostarine Product has "tremendous potential for bodybuilders and athletes of all stripes."  According to Defendant's website, "Studies reveal that Ostarine is effective in increasing lean muscle mass, strength and endurance, all while promoting fat loss. These studies also show that it increases libido and can be used by both men and women."  Defendant further claims that, "Studies have shown that, because of it's abilities to prevent muscle wasting, it has Studies [sic] have shown that Ostarine works by binding to androgen receptors in the muscles and bones to stimulate

anabolic activity; this process has been shown to increase protein synthesis, which leads to muscle growth. Because of this, it has outstanding applications for bulking, recomping and cutting." Moreover, Defendant promises consumers all of these purported benefits, without any negative side effects. For example, Defendant claims that, "When studies compared steroids or prohormones to the Ostarine SARM, it was shown to be safer and more effective. Studies reported that there is no need to pre- or on-cycle supports, no risk to your liver, no need for a long period of between cycles, little to no impact on cholesterol levels and no effect on the prostate or sexual organs. On top of that, data revealed Ostarine users experience a great sense of wellbeing and none of the aggression or rage that is usually associated with steroid use."

25.     Critically, Defendant makes all of these representations and offers its Ostarine Product as a "supplement" in capsule form, but makes the following contradictory "DISCLAIMER & WAIVER OF LIABILITY" on its label:

> The materials for sale are intended for laboratory and research use only. They are not for use as food additives, drugs, cosmetics, household chemicals or other inappropriate applications. You must be a minimum of 21 years of age or older to purchase this product. NOT FOR HUMAN CONSUMPTION.

26.     To the extent Defendant's Ostarine Product does not contain any label statements on its packages or containers, Defendant violates the FDCA. The FDCA requires a "statement of identity," among other things, on all products. According to the FDA, "Products lacking a statement of identity are either defaulted as a dietary supplement or a misbranded drug and referred to the DEA."

27.     However, Ostarine is not a "dietary supplement" and is currently under investigation as a new pharmaceutical drug. Thus, Defendant's Ostarine Product and any other products containing SARMs are not recognized as safe and effective for any of the

uses suggested by Defendant and may pose significant health and safety risks to consumers.

28.     The FDCA, 21 U.S.C. § 321(ff)(1) defines a "dietary supplement" as a vitamin; mineral; herb or other botanical; amino acid; dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or combination of the preceding substances.  Defendant's Ostarine Product and/or Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide) are not vitamins, minerals, herbs, botanicals, or amino acids.  Thus, Defendant's Ostarine Product cannot be legally sold as a "dietary supplement" and its inclusion in such product deems it adulterated.  *See* 21 U.S.C. 350(b).

29.     Pursuant to Section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)], a dietary supplement may not include an article authorized for investigation as a new drug for which substantial clinical investigations have been instituted and made public, unless the article was marketed as a dietary supplement or food before its authorization as a new drug.  According to the FDA, Ostarine is a selective androgen receptor modulator for which substantial clinical investigations have been instituted and made public with regard to the treatment of cancer cachexia, or muscle wasting.  The FDA has concluded that Ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigation.  Thus, Defendant's Ostarine Product, which primarily contains the pharmaceutical ingredient Ostarine, is also excluded from the definition of a dietary supplement under section 201(ff)(3)(B)(ii) of the FDCA.

30.     Under the FDCA, 21 U.S.C. § 201(g)(1) the term "drug" includes any articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, and articles (other than food) intended to affect the structure or any function of the body of man or other animals.  Although Defendant has

falsely advertised and misbranded its Ostarine Product as "intended for laboratory and research use only" and "NOT FOR HUMAN CONSUMPTION," its product is actually a "drug" as defined by section 201(g)(1) of the FDCA [21 U.S.C. § 321(g)(1)], because it is intended to cure, mitigate, treat, or prevent disease conditions and affect the structure and function of the body.  The intended use of a product may be determined by, among other things, its labeling claims, advertising, and circumstances surrounding its distribution.  *See* 21 C.F.R § 201.128.

31.   Defendant's statements and advertisements indicate that its Ostarine Product is intended to affect the structure and function of the body and is also intended for use in the treatment of certain conditions.  Defendant's statements demonstrating the intended use of its Ostarine Product include, but are not limited to, the following:

a.   "Ostarine is effective in increasing lean muscle mass, strength and endurance, all while promoting fat loss."

b.   "Ostarine is a SARM, or selective androgen receptor modulator, that was developed to prevent and treat muscle wasting associated with medical conditions, such as atrophy, cachexia and sarcopenia. Studies have shown that, because of it's [sic] abilities to prevent muscle wasting, it has tremendous potential for bodybuilders and athletes of all stripes."

c.   "[I]ncreases libido;"

d.   "[O]utstanding applications for bulking, recomping and cutting;" and

e.   "Ostarine users experience a great sense of wellbeing and none of the aggression or rage that is usually associated with steroid use."

32.   Defendant's Ostarine Product is also a "new drug" as defined by section 201(p) of the FDCA [21 U.S.C. § 321(p)], because it is not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling.  Under sections 301(d) and 505(a) of the FDCA [21 U.S.C. §§

331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for the new drug. No approved applications are in effect for Defendant's Ostarine Product.  Consequently, Defendant's marketing and sale of its Ostarine Product without such approved applications also violates the FDCA.

33.    Defendant's Ostarine Product is also a "prescription drug" as defined in section 503(b)(1)(A) of the FDCA [21 U.S.C. § 353(b)(1)(A)], because due to its toxicity or potentiality for harmful effect, the method of its use, or the collateral measures necessary for its use, it is not safe for use except under the supervision of a practitioner licensed by law to administer them.

34.    The FDA has previously concluded that products like Ostarine and Defendant's Ostarine Product are prescription drugs because they contain SARMs and, therefore, "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs."

35.    According to section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)], a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s).  "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended [21 CFR Part 201.5].  Prescription drugs can be used safely only at the direction, and under the supervision of a licensed practitioner.  Thus, it is impossible to write "adequate directions for use" for prescription drugs.  FDA-approved prescription drugs which bear the FDA-approved labeling are exempt from the requirements that they bear adequate directions for use by a layperson [21 CFR Part 201.100(c)(2) and 201.115].  Because there are no FDA-approved applications for Defendant's Ostarine Product, its labeling fails to bear adequate directions for its intended use, causing it to be misbranded under section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)].

36.   The introduction or delivery for introduction into interstate commerce of any misbranded drug is prohibited by 21 U.S.C. § 331(a).  Among other things, a drug is misbranded if its labeling is false or misleading.  21 U.S.C. § 352(a).  The introduction or delivery for introduction into interstate commerce of a misbranded drug is a felony.  21 U.S.C. § 333(a)(2).

37.   Defendant has falsely marketed and advertised its Ostarine Product, giving consumers the massive gains of illegal steroids and a false sense of security regarding its safety.  In reality, FN and its managing members knew all along that their product was not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant potential health and safety risks to consumers.

38.   Defendant's false advertising is harmful to the marketplace for dietary and nutritional supplements and potentially to individual consumers.  Defendant has created an illegitimate marketplace of young bodybuilders who will gain muscle "at all costs," but who are not informed of the dangers of Defendant's products.  Users of FN's Ostarine Product have little incentive to use a natural product like Advanced PCT until they are hurt or the product is taken off the shelves.

### Defendant DNA Anabolics & Its "Ostarine" Product

39.   Defendant DNA is a competing nutritional supplement company in Texas.

40.   According to DNA's "Ostarine" product's label, the active ingredient is a pharmaceutical ingredient known as Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide).

41.   On its website and through other promotional materials, Defendant touts numerous purported benefits of its "Ostarine" product.  For example and without limitation, Defendant claims that its "Ostarine" product is "great for strength," "great for lean mass gains," "great for body recomposition," "great for endurance," and has "joint healing abilities."  Defendant also claims that its "Ostarine" product "Increases Lean

Muscle Mass, "Increases Strength & Endurance, "Promotes Fat Loss," "Promotes Recovery," and even "Increases Libido," among other things.  Moreover, Defendant promises consumers all of these benefits from using its "Ostarine" product, with no side effects.  For example, Defendant claims, "in essence, SARMs such as Ostarine causes muscle growth in the same manner as steroids, however unlike testosterone and other anabolic steroids and prohormones, SARMs (as nonsteroidal agents) don't produce the growth effect on prostate and other secondary sexual organs."  Furthermore, Defendant claims that "not only does [Ostarine] represent a new potential treatment option for a wide spectrum of conditions from muscle wasting diseases (from age-related to AIDS or cancer-related), but is also has immense potential for muscle building for Bodybuilders, fitness, athletes and an agent to minimize atrophy during recovery periods from serious surgery or similar situations."

42.     In truth, SARMs, like Ostarine, are synthetic drugs intended to have the same kind of effects as androgenic drugs like illegal anabolic steroids.  Critically, SARMs are not legal as ingredients in any type of dietary supplement.

43.     The United States Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 321(ff)(1) defines a "dietary supplement" as a vitamin; mineral; herb or other botanical; amino acid; dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or combination of the preceding substances.  DNA's "Ostarine" product and/or Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide) are not vitamins, minerals, herbs, botanicals, or amino acids.  Thus, DNA's "Ostarine" product cannot be legally sold as a "dietary supplement" and its inclusion in such product deems it adulterated.  *See* 21 U.S.C. 350(b).

44.     Pursuant to Section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)], a dietary supplement may not include an article authorized for investigation as a new drug for which substantial clinical investigations have been

instituted and made public, unless the article was marketed as a dietary supplement or food before its authorization as a new drug.  According to the U.S. Food and Drug Administration ("FDA"), Ostarine is a selective androgen receptor modulator for which substantial clinical investigations have been instituted and made public with regard to the treatment of cancer cachexia, or muscle wasting.  The FDA has concluded that Ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigation.  Thus, DNA's "Ostarine" product, which primarily contains the pharmaceutical ingredient Ostarine, is also excluded from the definition of a dietary supplement under section 201(ff)(3)(B)(ii) of the FDCA.

45.    Under the FDCA, 21 U.S.C. § 201(g)(1) the term "drug" includes any articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, and articles (other than food) intended to affect the structure or any function of the body of man or other animals.  Although Defendant has falsely advertised and misbranded its "Ostarine" product as a "dietary supplement," "Ostarine" is actually a "drug" as defined by section 201(g)(1) of the FDCA [21 U.S.C. § 321(g)(1)], because it is intended to cure, mitigate, treat, or prevent disease conditions and affect the structure and function of the body.  The intended use of a product may be determined by, among other things, its labeling claims, advertising, and circumstances surrounding its distribution.  *See* 21 C.F.R § 201.128.

46.    Defendant's statements and advertisements indicate that its "Ostarine" product is intended to affect the structure and function of the body and is also intended for use in the treatment of certain conditions.  Defendant's statements demonstrating the intended use of "Ostarine" include, but are not limited to, the following:

a.    "Ostarine is the SARM that is being developed for the prevention and treatment of muscle wasting. It is currently undergoing clinical trials and may eventually be the medical prescription for prevention of

cachexia, atrophy, and sarcopenia and for Hormone or Testosterone Replacement Therapy."

b. "As a research chemical, Ostarine belongs to a class of chemicals known as SARMs or selective androgen receptor modulators. SARMs create selective anabolic activity at certain androgen receptors and not others, hence their name. Compared to testosterone and other anabolic steroids and prohormones, the advantage of SARMs such as (Ostarine) MK-2688 is that they do not have androgenic activity in non-skeletal-muscle tissues."

c. "Ostarine is effective in not only maintaining lean body mass (LBM) but actually increasing it."

d. "Binding and activation of the Androgen receptor alters the expression of genes and increases protein synthesis, hence builds muscle."

e. "So in essence, SARMs such as Ostarine causes muscle growth in the same manner as steroids, however unlike testosterone and other anabolic steroids and prohormones, SARMs (as nonsteroidal agents) don't produce the growth effect on prostate and other secondary sexual organs."

f. "Ostarine in particular exerts its anabolic effects on muscle tissue almost exclusively. So not only does it represent a new potential treatment option for a wide spectrum of conditions from muscle wasting diseases (from age-related to AIDS or cancer-related), but is also has immense potential for muscle building for Bodybuilders, fitness, athletes and an agent to minimize atrophy during recovery periods from serious surgery or similar situations."

g.  "To date Ostarine has been evaluated in eight clinical trials involving approximately 600 subjects including three efficacy studies. A four month Phase IIb clinical trial enrolled 159 patients with the study meeting its primary objective of an absolute increase in total lean body mass (muscle) compared to placebo and the secondary objective of muscle function (increase in strength). In particular application to bodybuilding, there have been many logs of users on various forums using Ostarine as an aid to increase lean body mass and strength levels."

h.  "Lean muscle gains (bulking) … As Ostarine is the most anabolic of the available SARMs, its first and foremost use must be when trying to gain lean muscle. Now the gains in absolute weight won't be comparable to steroids such as dianabol, however what will be gained will almost exclusively be lean mass. Due to the lack of shutdown in comparison to steroids/prohormones, a PCT period is not needed and almost all the mass that is gained on Ostarine is kept once the cycle is finished. Doses of 25mg for 4-6 weeks are the most common protocol for such goals. Over this 4-6 week period will typically produce 6lbs or 3kg of lean, keepable gains. However the abundant side effects of steroids/prohormones will not be present. Users have as high as 36mg [only recommended for those who weigh in at 210lbs (95kg)+] for periods as long as 8 weeks. However the potential for suppression from such doses is higher and users would have to look into a PCT protocol after undergoing such a cycle."

i.  "Losing Bodyfat (cutting) … Ostarine would primarily fit into a cutting protocol for the maintenance of muscle mass whilst reducing calories. One of the most disheartening outcomes of cutting is the loss

hard earned muscle mass. The drop in metabolic rate and hormone levels (T3, IGF, Testosterone etc.) with the lack of calories is a perfect catabolic environment for loss of muscle tissue. As Ostarine has anabolic effects, the dieter can cut calories without having to worry about muscle or strength loss. Ostarine has also shown noticeable nutrient partitioning effects among users, another reason why it can be of great help when cutting. A 12.5-15mg dosing protocol for 4-6 weeks is good for cutting with Ostarine without undergoing any side effects or suppression. However it must be stated that due to the lack of androgenicity, muscle hardness and overall results are not as prominent as with the SARM S-4."

j.   "Recomping (gaining muscle and losing bodyfat at the same time) … In our opinion, along with lean gains in muscle mass, Recomping is where Ostarine really shines. The recomping effect of losing fat and gaining muscle at the same time is what the majority of users are looking for. Trying to achieve this when you are not absolutely new to training is extremely difficult. Where Ostarine shines for recomping is in its nutrient partitioning benefits. Calories are taken from fat stores and calorie intake is fed to the muscle tissue. In fact many users report that Ostarine consumed at maintenance calories produces weight loss, whilst still getting increases in strength and muscle mass! One of the most important factors of recomping is TIME. As you are trying to achieve multiple objectives, it requires a longer time period to notice good recomp effects so even when running steroids, these would have to be longer run injectable compounds as oppose to the short used liver toxic oral steroids/prohormones. Although Ostarine is taken orally, as it is not methylated it is not as liver toxic as other oral

steroids/prohormones. Therefore it can be run for longer than the standard 4 week period with the aforementioned compounds. The dosing protocol of 12.5-25mg for 4-8 weeks will give excellent recomp effects. Diet must also be optimized to where calories are just above maintenance with at least 30% coming from lean sources of protein to get the best recomp effect."

k. "Injury Prevention … As mentioned by Furuya, the effects of MK-2688 translate to anabolism in bone as well as skeletal muscle tissue, which means it could be used in the future for a wide variety of uses such as osteoporosis and as a concurrent treatment with drugs that reduce bone density.  Therefore it has great application as a compound to use for rehabilitation of injuries, in particular bone and tendon related injuries. Doses of 12.5mg per day is recommend for such purposes and improvement in joint movement that can be seen after just 6-8 days."

l. Timing of Doses … As Ostarine has a half life of around 24 hours, each of these doses only has to be taken orally once a day, therefore it's also offers an extremely convenient supplementation intake. Ostarine cannot be aromatized, conferring all their effects to AR binding and not to metabolic conversion to active androgens/estrogens. However blood work from users has shown a slight elevation in serum estradiol levels (which may be one of the factors in its high effectiveness for treating tendon, ligament, and bone injuries or illnesses. This elevation is extremely small and is no case for concern. If however you are absolutely concerned about slight increases in Estrogen, you can always opt for low doses of OTC

AI's such as 6bromo or very very low doses of prescription AI's like adex or aromasin.

m. Great sense of well being while on, (without the aggression which can often detrimentally impact users' daily lives).

n. Ostarine (MK-2866) also resulted in a dose-dependent decrease in LDL and HDL cholesterol levels, with the average LDL/HDL ratio for all doses remaining in the low cardiovascular risk category – hence there is little impact on cholesterol values.

o. Advantages Of Ostarine when compared to other SARMs … The metabolite M1 which seems to cause toxicity in S4 (temporary ocular disturbances) is not present in Ostarine. Also unlike S4, Ostarine does not have androgenic properties in non muscle tissue.

47.    Ostarine and DNA's "Ostarine" product are also "new drugs" as defined by section 201(p) of the FDCA [21 U.S.C. § 321(p)], because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.  Under sections 301(d) and 505(a) of the FDCA [21 U.S.C. §§ 331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for the new drug.  No approved applications are in effect for Ostarine and/or DNA's "Ostarine" product.  Consequently, Defendant's marketing and sale of its "Ostarine" product without such approved applications also violates the FDCA.

48.    Ostarine and DNA's "Ostarine" product are also "prescription drugs" as defined in section 503(b)(1)(A) of the FDCA [21 U.S.C. § 353(b)(1)(A)], because due to their toxicity or potentiality for harmful effect, the method of their use, or the collateral measures necessary for their use, they are not safe for use except under the supervision of a practitioner licensed by law to administer them.

49.     The FDA has previously concluded that products like Ostarine are prescription drugs because they contain SARMs and, therefore, "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs."

50.     According to section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)], a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s).  "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended [21 CFR Part 201.5]. Prescription drugs can be used safely only at the direction, and under the supervision of a licensed practitioner.  Thus, it is impossible to write "adequate directions for use" for prescription drugs.  FDA-approved prescription drugs which bear the FDA-approved labeling are exempt from the requirements that they bear adequate directions for use by a layperson [21 CFR Part 201.100(c)(2) and 201.115].  Because there are no FDA-approved applications for Ostarine, Defendant's labeling fails to bear adequate directions for its intended use, causing it to be misbranded under section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)].

51.     The introduction or delivery for introduction into interstate commerce of any misbranded drug is prohibited by 21 U.S.C. § 331(a).  Among other things, a drug is misbranded if its labeling is false or misleading.  21 U.S.C. § 352(a).  The introduction or delivery for introduction into interstate commerce of a misbranded drug is a felony.  21 U.S.C. § 333(a)(2).

52.     SARM drugs such as DNA's "Ostarine" product are still in the research and testing phases and are currently undergoing investigation and development from a number of pharmaceutical companies.  Accordingly, DNA's "Ostarine" product is not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant potential health and safety risks to consumers.

53.     Defendant has falsely marketed and advertised its "Ostarine" product, giving consumers the massive gains of illegal steroids and a false sense of security regarding its safety.  In reality, DNA and its members knew all along that their product was not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant potential health and safety risks to consumers.

54.     Defendant's false advertising is harmful to the marketplace for dietary and nutritional supplements and potentially to individual consumers.  Defendant has created an illegitimate marketplace of young bodybuilders who will gain muscle "at all costs," but who are not informed of the dangers of Defendant's products.  Users of DNA's "Ostarine" product have little incentive to use a natural product like Advanced PCT until they are hurt or the product is taken off the shelves.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Unlawful Business Practices Cal. Bus. & Prof. Code § 17200)**

**(against Defendant FN)**

55.     Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

56.     California Business & Professions Code § 17200 provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

57.     Defendant has engaged in unlawful, unfair and fraudulent conduct by way of its false, deceptive, and misleading marketing, advertising, and sale of its Ostarine Product.  For example, Defendant has purposely misrepresented and sold its product as a "supplement" in capsule form, but makes the following contradictory "DISCLAIMER & WAIVER OF LIABILITY" on its label:

The materials for sale are intended for laboratory and research use only. They are not for use as food additives, drugs, cosmetics, household chemicals or other inappropriate applications. You must be a minimum of 21 years of age or older to purchase this product. NOT FOR HUMAN CONSUMPTION.

58.     To the extent Defendant's Ostarine Product does not contain any label statements on its packages or containers, Defendant violates the FDCA. The FDCA requires a "statement of identity," among other things, on all products. According to the FDA, "Products lacking a statement of identity are either defaulted as a dietary supplement or a misbranded drug and referred to the DEA."

59.     However, Ostarine is not a "dietary supplement" and is currently under investigation as a new pharmaceutical drug. Thus, Defendant's Ostarine Product and any other products containing SARMs are not recognized as safe and effective for any of the uses suggested by Defendant and may pose significant health and safety risks to consumers.

60.     The FDCA, 21 U.S.C. § 321(ff)(1) defines a "dietary supplement" as a vitamin; mineral; herb or other botanical; amino acid; dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or combination of the preceding substances. Defendant's Ostarine Product and/or Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide) are not vitamins, minerals, herbs, botanicals, or amino acids. Thus, Defendant's Ostarine Product cannot be legally sold as a "dietary supplement" and its inclusion in such product deems it adulterated. *See* 21 U.S.C. 350(b).

61.     Pursuant to Section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)], a dietary supplement may not include an article authorized for

investigation as a new drug for which substantial clinical investigations have been instituted and made public, unless the article was marketed as a dietary supplement or food before its authorization as a new drug.  According to the FDA, Ostarine is a selective androgen receptor modulator for which substantial clinical investigations have been instituted and made public with regard to the treatment of cancer cachexia, or muscle wasting.  The FDA has concluded that Ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigation.  Thus, Defendant's Ostarine Product, which primarily contains the pharmaceutical ingredient Ostarine, is also excluded from the definition of a dietary supplement under section 201(ff)(3)(B)(ii) of the FDCA.

62.     Under the FDCA, 21 U.S.C. § 201(g)(1) the term "drug" includes any articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, and articles (other than food) intended to affect the structure or any function of the body of man or other animals.  Although Defendant has falsely advertised and misbranded its Ostarine Product as "intended for laboratory and research use only" and "NOT FOR HUMAN CONSUMPTION," its product is actually a "drug" as defined by section 201(g)(1) of the FDCA [21 U.S.C. § 321(g)(1)], because it is intended to cure, mitigate, treat, or prevent disease conditions and affect the structure and function of the body.  The intended use of a product may be determined by, among other things, its labeling claims, advertising, and circumstances surrounding its distribution.  *See* 21 C.F.R § 201.128.

63.     Defendant's statements and advertisements indicate that its Ostarine Product is intended to affect the structure and function of the body and is also intended for use in the treatment of certain conditions.  Defendant's statements demonstrating the intended use of its Ostarine Product include, but are not limited to, the following:

a.   "Ostarine is effective in increasing lean muscle mass, strength and endurance, all while promoting fat loss."

b.   "Ostarine is a SARM, or selective androgen receptor modulator, that was developed to prevent and treat muscle wasting associated with medical conditions, such as atrophy, cachexia and sarcopenia. Studies have shown that, because of it's [sic] abilities to prevent muscle wasting, it has tremendous potential for bodybuilders and athletes of all stripes."

c.   "[I]ncreases libido;"

d.   "[O]utstanding applications for bulking, recomping and cutting;" and

e.   "Ostarine users experience a great sense of wellbeing and none of the aggression or rage that is usually associated with steroid use."

64.    Defendant's Ostarine Product is also a "new drug" as defined by section 201(p) of the FDCA [21 U.S.C. § 321(p)], because it is not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling.  Under sections 301(d) and 505(a) of the FDCA [21 U.S.C. §§ 331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for the new drug. No approved applications are in effect for Defendant's Ostarine Product.  Consequently, Defendant's marketing and sale of its Ostarine Product without such approved applications also violates the FDCA.

65.    Defendant's Ostarine Product is also a "prescription drug" as defined in section 503(b)(1)(A) of the FDCA [21 U.S.C. § 353(b)(1)(A)], because due to its toxicity or potentiality for harmful effect, the method of its use, or the collateral measures necessary for its use, it is not safe for use except under the supervision of a practitioner licensed by law to administer them.

66.    The FDA has previously concluded that products like Ostarine and Defendant's Ostarine Product are prescription drugs because they contain SARMs and,

therefore, "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs."

67.     According to section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)], a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s).  "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended [21 CFR Part 201.5].  Prescription drugs can be used safely only at the direction, and under the supervision of a licensed practitioner.  Thus, it is impossible to write "adequate directions for use" for prescription drugs.  FDA-approved prescription drugs which bear the FDA-approved labeling are exempt from the requirements that they bear adequate directions for use by a layperson [21 CFR Part 201.100(c)(2) and 201.115].  Because there are no FDA-approved applications for Defendant's Ostarine Product, its labeling fails to bear adequate directions for its intended use, causing it to be misbranded under section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)].

68.     The introduction or delivery for introduction into interstate commerce of any misbranded drug is prohibited by 21 U.S.C. § 331(a).  Among other things, a drug is misbranded if its labeling is false or misleading.  21 U.S.C. § 352(a).  The introduction or delivery for introduction into interstate commerce of a misbranded drug is a felony.  21 U.S.C. § 333(a)(2).

69.     Defendant has also engaged in unlawful, unfair and fraudulent conduct by way of its false and misleading statements that its Ostarine Product affords similar benefits to steroid and prohormones, without the negative side effects.  For example, Defendant claims on its website as follows:  "When studies compared steroids or prohormones to the Ostarine SARM, it was shown to be safer and more effective. Studies reported that there is no need to pre- or on-cycle supports, no risk to your liver, no need for a long period of between cycles, little to no impact on cholesterol levels and no effect on the prostate or sexual organs.  On top of that, data revealed Ostarine users experience

a great sense of wellbeing and none of the aggression or rage that is usually associated with steroid use."

70.     However, SARM drugs such FN's Ostarine Product are still in the research and testing phases and are currently undergoing investigation and development from a number of pharmaceutical companies.  Thus, Defendant's Ostarine Product, and any other products containing SARMs, are not recognized as safe and effective for any of the uses suggested by Defendant and may pose significant health and safety risks to consumers.

71.     Indeed, medical experts have opined that products containing SARMs "have **many recognized potential serious side effects**, including hepatoxicity (liver damage), and markedly lower plasma HDL cholesterol (raising the risk of heart disease)," and may have even more serious consequences that are currently unknown.  In fact, since Ostarine is only in phase II clinical trials, medical experts have emphasized that there is "<u>no evidence that Ostarine is safe for humans to consume</u>."  Thus, medical experts have concluded that the sale of products containing SARMs, like Defendant's Ostarine Product, is "**highly dangerous to public safety**."

72.     Moreover, Defendant fails to disclose that SARMs are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, despite the fact that Defendant specifically markets its products to body builders and other competitive athletes.

73.     By reason of Defendant's acts of unfair competition, Plaintiff has suffered and will continue to suffer irreparable injury unless and until this Court enters an order enjoining Defendant from any further acts of unfair competition.  Defendant's continuing acts of unfair competition, unless enjoined, will cause irreparable damage to Plaintiff in that it will have no adequate remedy at law to compel Plaintiff to cease such acts, and no way to determine its losses proximately caused by such acts of Defendant.  Plaintiff is

therefore entitled to a preliminary injunction and a permanent injunction against further unlawful and unfair conduct by Defendant.

74.    As a direct and proximate result of the Defendant's acts of unfair competition, Defendant has wrongfully taken Plaintiff's profits and the benefit of its creativity and investment of time, energy and money.  Defendant should therefore disgorge all profits from the above conduct and further should be ordered to perform full restitution to Plaintiff as a consequence of Defendant's unlawful and unfair activities.

## SECOND CLAIM FOR RELIEF

### (False And Misleading Advertising Cal. Bus. & Prof. Code § 17500)

### (Against Defendant FN)

75.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

76.    This cause of action is brought pursuant to the Unfair Competition Law at California Business & Professions Code § 17500 *et seq*.

77.    Defendant has disseminated advertising before the public and consumers in California that: (a) contains statements that are illegal, untrue and/or misleading; (b) Defendant knew, or in the exercise of reasonable care should have known, is illegal, untrue and/or misleading; (c) concerns the sale of a product; and (d) is likely to mislead or deceive a reasonable consumer.

78.    For example and without limitation, Defendant has purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of its product, such as misrepresenting its Ostarine Product as "intended for laboratory and research use only" and "NOT FOR HUMAN CONSUMPTION," while simultaneously advertising and selling its product as a "drug" and/or "dietary supplement."

79.    Defendant has also purposely made false and misleading statements that its Ostarine Product affords similar benefits to steroid and prohormones, without the negative side effects.  For example, Defendant claims on its website as follows:  "When

studies compared steroids or prohormones to the Ostarine SARM, it was shown to be safer and more effective. Studies reported that there is no need to pre- or on-cycle supports, no risk to your liver, no need for a long period of between cycles, little to no impact on cholesterol levels and no effect on the prostate or sexual organs.  On top of that, data revealed Ostarine users experience a great sense of wellbeing and none of the aggression or rage that is usually associated with steroid use."

80.    However, the FDA has previously concluded that similar products containing Ostarine "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs." Thus, Defendant's Ostarine Product is not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant health and safety risks to consumers.

81.    The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers in California into believing that they are purchasing a product with different characteristics.

82.    The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the consequences of taking steroids or illegal substances.

83.    Defendant has introduced its false and misleading statements into California via marketing and advertising on various websites and shipment of its product containing false and misleading advertising into California.

84.    Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to FN and the loss of goodwill in Plaintiff's products.  Indeed, FN's conduct is a black eye on the industry as a whole, and has the tendency to disparage Plaintiff's products and goodwill.

85.    Defendant's actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in California which, in commercial

advertising and promotion, misrepresent the nature, characteristics, and qualities of their products in violation of the False Advertising Law at Business & Professions Code § 17500, *et seq.*

## THIRD CLAIM FOR RELIEF

### (False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act)
### (Against Defendant FN)

86.    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

87.    Defendant has purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of its product, such as misrepresenting its Ostarine Product as "intended for laboratory and research use only" and "NOT FOR HUMAN CONSUMPTION," while simultaneously advertising and selling its product as a bodybuilding product.

88.    Defendant has also purposely made false and misleading statements that its Ostarine Product affords similar benefits to steroid and prohormones, without the negative side effects.  For example, Defendant claims on its website as follows:  "When studies compared steroids or prohormones to the Ostarine SARM, it was shown to be safer and more effective. Studies reported that there is no need to pre- or on-cycle supports, no risk to your liver, no need for a long period of between cycles, little to no impact on cholesterol levels and no effect on the prostate or sexual organs.  On top of that, data revealed Ostarine users experience a great sense of wellbeing and none of the aggression or rage that is usually associated with steroid use."

89.    However, the FDA has previously concluded that similar products containing Ostarine "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs." Thus, Defendant's Ostarine Product is not recognized among experts as safe and

effective for use under the conditions suggested by Defendant and may pose significant health and safety risks to consumers.

90.     The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers, including those in this forum, into believing that they are purchasing a product with different characteristics.

91.     The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the consequences of taking steroids or illegal substances.

92.     Defendants have introduced their false and misleading statements into interstate commerce via marketing and advertising on various websites and shipment of their products into interstate commerce containing false and misleading advertising.

93.     Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to Defendants and the loss of goodwill in Plaintiff's products.  Indeed, Defendants' conduct is a black eye on the industry as a whole, and has the tendency to disparage Plaintiff's products and goodwill.

Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of its products in violation of Section 43(a)(1)(B) of the Lanham Act.

## CLAIMS FOR RELIEF

## FOURTH CLAIM FOR RELIEF

### (Unlawful Business Practices Cal. Bus. & Prof. Code § 17200)

### (against Defendant DNA)

94.     Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

95.     California Business & Professions Code § 17200 provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or

practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

96.     Defendant has engaged in unlawful, unfair and fraudulent conduct by way of its false, deceptive, and misleading marketing, advertising, and sale of its "Ostarine" product.  For example, Defendant has purposely misrepresented and sold its product "Ostarine" as a "dietary supplement."

97.     Contrary to Defendant's representations, its "Ostarine" product is primarily composed of the unapproved new investigational drug Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide).

98.     In truth, SARMs, like DNA's "Ostarine" product, are synthetic drugs intended to have the same kind of effects as androgenic drugs like illegal anabolic steroids.  Critically, SARMs are not legal as ingredients in any type of dietary supplement.

99.     The FDCA, 21 U.S.C. § 321(ff)(1) defines a "dietary supplement" as a vitamin; mineral; herb or other botanical; amino acid; dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract, or combination of the preceding substances.  DNA's "Ostarine" product and Ostarine / MK-2866 ((2S)-3-(4-cyanophenoxy)-N-[4-cyano-3-(trifluoromethyl)phenyl]-2-hydroxy-2-methylpropanamide) are not vitamins, minerals, herbs, botanicals, or amino acids.  Thus, DNA's "Ostarine" product cannot be legally sold as a "dietary supplement" and its inclusion in such product deems it adulterated.  *See* 21 U.S.C. 350(b).

100.     Pursuant to Section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)], a dietary supplement may not include an article authorized for investigation as a new drug for which substantial clinical investigations have been

instituted and made public, unless the article was marketed as a dietary supplement or food before its authorization as a new drug.  According to the FDA, Ostarine is a selective androgen receptor modulator for which substantial clinical investigations have been instituted and made public with regard to the treatment of cancer cachexia, or muscle wasting.  The FDA has concluded that Ostarine was not marketed as a dietary supplement or as a food until after it was under substantial clinical investigation.  Thus, DNA's "Ostarine" product, which primarily contains the pharmaceutical ingredient Ostarine, is also excluded from the definition of a dietary supplement under section 201(ff)(3)(B)(ii) of the FDCA.

101.   Under the FDCA, 21 U.S.C. § 201(g)(1) the term "drug" includes any articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, and articles (other than food) intended to affect the structure or any function of the body of man or other animals.  Although Defendant has falsely advertised and misbranded its "Ostarine" product as a "dietary supplement," "Ostarine" is actually a "drug" as defined by section 201(g)(1) of the FDCA [21 U.S.C. § 321(g)(1)], because it is intended to cure, mitigate, treat, or prevent disease conditions and affect the structure and function of the body.  The intended use of a product may be determined by, among other things, its labeling claims, advertising, and circumstances surrounding its distribution.  *See* 21 C.F.R § 201.128.

102.   Defendant's statements and advertisements indicate that its "Ostarine" product is intended to affect the structure and function of the body and is also intended for use in the treatment of certain conditions.  Defendant's statements demonstrating the intended use of its "Ostarine" product include, but are not limited to, the following:

> a.   "Ostarine is the SARM that is being developed for the prevention and treatment of muscle wasting. It is currently undergoing clinical trials and may eventually be the medical prescription for prevention of

cachexia, atrophy, and sarcopenia and for Hormone or Testosterone Replacement Therapy."

b. "As a research chemical, Ostarine belongs to a class of chemicals known as SARMs or selective androgen receptor modulators. SARMs create selective anabolic activity at certain androgen receptors and not others, hence their name. Compared to testosterone and other anabolic steroids and prohormones, the advantage of SARMs such as (Ostarine) MK-2688 is that they do not have androgenic activity in non-skeletal-muscle tissues."

c. "Ostarine is effective in not only maintaining lean body mass (LBM) but actually increasing it."

d. "Binding and activation of the Androgen receptor alters the expression of genes and increases protein synthesis, hence builds muscle."

e. "So in essence, SARMs such as Ostarine causes muscle growth in the same manner as steroids, however unlike testosterone and other anabolic steroids and prohormones, SARMs (as nonsteroidal agents) don't produce the growth effect on prostate and other secondary sexual organs."

f. "Ostarine in particular exerts its anabolic effects on muscle tissue almost exclusively. So not only does it represent a new potential treatment option for a wide spectrum of conditions from muscle wasting diseases (from age-related to AIDS or cancer-related), but is also has immense potential for muscle building for Bodybuilders, fitness, athletes and an agent to minimize atrophy during recovery periods from serious surgery or similar situations."

g. "To date Ostarine has been evaluated in eight clinical trials involving approximately 600 subjects including three efficacy studies. A four month Phase IIb clinical trial enrolled 159 patients with the study meeting its primary objective of an absolute increase in total lean body mass (muscle) compared to placebo and the secondary objective of muscle function (increase in strength). In particular application to bodybuilding, there have been many logs of users on various forums using Ostarine as an aid to increase lean body mass and strength levels."

h. "Lean muscle gains (bulking) … As Ostarine is the most anabolic of the available SARMs, its first and foremost use must be when trying to gain lean muscle. Now the gains in absolute weight won't be comparable to steroids such as dianabol, however what will be gained will almost exclusively be lean mass. Due to the lack of shutdown in comparison to steroids/prohormones, a PCT period is not needed and almost all the mass that is gained on Ostarine is kept once the cycle is finished. Doses of 25mg for 4-6 weeks are the most common protocol for such goals. Over this 4-6 week period will typically produce 6lbs or 3kg of lean, keepable gains. However the abundant side effects of steroids/prohormones will not be present. Users have as high as 36mg [only recommended for those who weigh in at 210lbs (95kg)+] for periods as long as 8 weeks. However the potential for suppression from such doses is higher and users would have to look into a PCT protocol after undergoing such a cycle."

i. "Losing Bodyfat (cutting) **…** Ostarine would primarily fit into a cutting protocol for the maintenance of muscle mass whilst reducing calories. One of the most disheartening outcomes of cutting is the loss

hard earned muscle mass. The drop in metabolic rate and hormone levels (T3, IGF, Testosterone etc.) with the lack of calories is a perfect catabolic environment for loss of muscle tissue. As Ostarine has anabolic effects, the dieter can cut calories without having to worry about muscle or strength loss. Ostarine has also shown noticeable nutrient partitioning effects among users, another reason why it can be of great help when cutting. A 12.5-15mg dosing protocol for 4-6 weeks is good for cutting with Ostarine without undergoing any side effects or suppression. However it must be stated that due to the lack of androgenicity, muscle hardness and overall results are not as prominent as with the SARM S-4."

j.   "Recomping (gaining muscle and losing bodyfat at the same time) … In our opinion, along with lean gains in muscle mass, Recomping is where Ostarine really shines. The recomping effect of losing fat and gaining muscle at the same time is what the majority of users are looking for. Trying to achieve this when you are not absolutely new to training is extremely difficult. Where Ostarine shines for recomping is in its nutrient partitioning benefits. Calories are taken from fat stores and calorie intake is fed to the muscle tissue. In fact many users report that Ostarine consumed at maintenance calories produces weight loss, whilst still getting increases in strength and muscle mass! One of the most important factors of recomping is TIME. As you are trying to achieve multiple objectives, it requires a longer time period to notice good recomp effects so even when running steroids, these would have to be longer run injectable compounds as oppose to the short used liver toxic oral steroids/prohormones. Although Ostarine is taken orally, as it is not methylated it is not as liver toxic as other oral

steroids/prohormones. Therefore it can be run for longer than the standard 4 week period with the aforementioned compounds. The dosing protocol of 12.5-25mg for 4-8 weeks will give excellent recomp effects. Diet must also be optimized to where calories are just above maintenance with at least 30% coming from lean sources of protein to get the best recomp effect."

k. "Injury Prevention … As mentioned by Furuya, the effects of MK-2688 translate to anabolism in bone as well as skeletal muscle tissue, which means it could be used in the future for a wide variety of uses such as osteoporosis and as a concurrent treatment with drugs that reduce bone density. Therefore it has great application as a compound to use for rehabilitation of injuries, in particular bone and tendon related injuries. Doses of 12.5mg per day is recommend for such purposes and improvement in joint movement that can be seen after just 6-8 days."

l. Timing of Doses … As Ostarine has a half life of around 24 hours, each of these doses only has to be taken orally once a day, therefore it's also offers an extremely convenient supplementation intake. Ostarine cannot be aromatized, conferring all their effects to AR binding and not to metabolic conversion to active androgens/estrogens. However blood work from users has shown a slight elevation in serum estradiol levels (which may be one of the factors in its high effectiveness for treating tendon, ligament, and bone injuries or illnesses. This elevation is extremely small and is no case for concern. If however you are absolutely concerned about slight increases in Estrogen, you can always opt for low doses of OTC

AI's such as 6bromo or very very low doses of prescription AI's like adex or aromasin.

m. Great sense of well being while on, (without the aggression which can often detrimentally impact users' daily lives).

n. Ostarine (MK-2866) also resulted in a dose-dependent decrease in LDL and HDL cholesterol levels, with the average LDL/HDL ratio for all doses remaining in the low cardiovascular risk category – hence there is little impact on cholesterol values.

o. Advantages Of Ostarine when compared to other SARMs **…** The metabolite M1 which seems to cause toxicity in S4 (temporary ocular disturbances) is not present in Ostarine. Also unlike S4, Ostarine does not have androgenic properties in non muscle tissue.

103.   Ostarine and DNA's "Ostarine" product are also "new drugs" as defined by section 201(p) of the FDCA [21 U.S.C. § 321(p)], because they are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.  Under sections 301(d) and 505(a) of the FDCA [21 U.S.C. §§ 331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for the new drug.  No approved applications are in effect for Ostarine and/or DNA's "Ostarine" product.  Consequently, Defendant's marketing and sale of its Ostarine product without such approved applications also violates the FDCA.

104.   Ostarine and DNA's "Ostarine" product are also "prescription drugs" as defined in section 503(b)(1)(A) of the FDCA [21 U.S.C. § 353(b)(1)(A)], because due to their toxicity or potentiality for harmful effect, the method of their use, or the collateral measures necessary for their use, they are not safe for use except under the supervision of a practitioner licensed by law to administer them.

105.   The FDA has previously concluded that products like Ostarine and DNA's "Ostarine" product are prescription drugs because they contain SARMs and, therefore, "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs."

106.   According to section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)], a drug is misbranded if, among other things, it fails to bear adequate directions for its intended use(s).  "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended [21 CFR Part 201.5]. Prescription drugs can be used safely only at the direction, and under the supervision of a licensed practitioner.  Thus, it is impossible to write "adequate directions for use" for prescription drugs.  FDA-approved prescription drugs which bear the FDA-approved labeling are exempt from the requirements that they bear adequate directions for use by a layperson [21 CFR Part 201.100(c)(2) and 201.115].  Because there are no FDA-approved applications for Ostarine and/or DNA's "Ostarine" product, Defendant's labeling fails to bear adequate directions for its intended use, causing "Ostarine" to be misbranded under section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)].

107.   The introduction or delivery for introduction into interstate commerce of any misbranded drug is prohibited by 21 U.S.C. § 331(a).  Among other things, a drug is misbranded if its labeling is false or misleading.  21 U.S.C. § 352(a).  The introduction or delivery for introduction into interstate commerce of a misbranded drug is a felony.  21 U.S.C. § 333(a)(2).

108.   Defendant has also engaged in unlawful, unfair and fraudulent conduct by way of their false and misleading statements that its "Ostarine" product is "great for strength," "great for lean mass gains," "great for body recomposition," "great for endurance," and has "joint healing abilities."  Defendant also claims that its "Ostarine" product "Increases Lean Muscle Mass, "Increases Strength & Endurance, "Promotes Fat Loss," "Promotes Recovery," and even "Increases Libido."  Moreover, Defendant

promises consumers all of these benefits from using its "Ostarine" product, with no side effects.  For example, Defendant claims, "in essence, SARMs such as Ostarine causes muscle growth in the same manner as steroids, however unlike testosterone and other anabolic steroids and prohormones, SARMs (as nonsteroidal agents) don't produce the growth effect on prostate and other secondary sexual organs."  Furthermore, Defendant claims that "not only does [Ostarine] represent a new potential treatment option for a wide spectrum of conditions from muscle wasting diseases (from age-related to AIDS or cancer-related), but is also has immense potential for muscle building for Bodybuilders, fitness, athletes and an agent to minimize atrophy during recovery periods from serious surgery or similar situations."

109.   However, SARM drugs such "Ostarine" are still in the research and testing phases and are currently undergoing investigation and development from a number of pharmaceutical companies.  Thus, Defendant's "Ostarine" product, and any other products containing SARMs, are not recognized as safe and effective for any of the uses suggested by Defendant and may pose significant health and safety risks to consumers.

110.   Indeed, medical experts have opined that products containing SARMs "have many recognized potential serious side effects, including hepatoxicity (liver damage), and markedly lower plasma HDL cholesterol (raising the risk of heart disease)," and may have even more serious consequences that are currently unknown.  In fact, since Ostarine is only in phase II clinical trials, medical experts have emphasized that there is "<u>no evidence that Ostarine is safe for humans to consume</u>."  Thus, medical experts have concluded that the sale of products containing SARMs, like Defendant's "Ostarine" product, is "highly dangerous to public safety."

111.   Moreover, Defendant fails to disclose that SARMs are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, despite the fact that Defendant markets its products to body builders and other competitive athletes.

112.   By reason of Defendant's acts of unfair competition, Plaintiff has suffered, and will continue to suffer, irreparable injury unless and until this Court enters an order enjoining Defendant from any further acts of unfair competition.  Defendant's continuing acts of unfair competition, unless enjoined, will cause irreparable damage to Plaintiff in that it will have no adequate remedy at law to compel Plaintiff to cease such acts, and no way to determine its losses proximately caused by such acts of Defendant.  Plaintiff is therefore entitled to a preliminary injunction and a permanent injunction against further unlawful and unfair conduct by Defendant.

113.   As a direct and proximate result of the Defendant's acts of unfair competition, Defendant has wrongfully taken Plaintiff's profits and the benefit of its creativity and investment of time, energy and money.  Defendant should therefore disgorge all profits from the above conduct and further should be ordered to perform full restitution to Plaintiff as a consequence of Defendant's unlawful and unfair activities.

## FIFTH CLAIM FOR RELIEF

### (False And Misleading Advertising Cal. Bus. & Prof. Code § 17500)

### (Against Defendant DNA)

114.   Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

115.   This cause of action is brought pursuant to the Unfair Competition Law at California Business & Professions Code § 17500 *et seq.*

116.   Defendant has disseminated advertising before the public and consumers in California that: (a) contains statements that are illegal, untrue and/or misleading; (b) Defendant knew, or in the exercise of reasonable care should have known, is illegal, untrue and/or misleading; (c) concerns the sale of a product; and (d) is likely to mislead or deceive a reasonable consumer.

117. Defendant has purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of its "Ostarine" product, such as misrepresenting "Ostarine" as a "dietary supplement."

118. Defendant has purposely made false and misleading statements that "Ostarine" has numerous purported benefits, including but not limited to, "great for strength," "great for lean mass gains," "great for body recomposition," "great for endurance," and has "joint healing abilities." Defendant also claims that its "Ostarine" product "Increases Lean Muscle Mass, "Increases Strength & Endurance, "Promotes Fat Loss," "Promotes Recovery," and even "Increases Libido." Moreover, Defendant promises consumers all of these benefits from using its "Ostarine" product, with no side effects. For example, Defendant claims, "in essence, SARMs such as Ostarine causes muscle growth in the same manner as steroids, however unlike testosterone and other anabolic steroids and prohormones, SARMs (as nonsteroidal agents) don't produce the growth effect on prostate and other secondary sexual organs." Furthermore, Defendant claims that "not only does [Ostarine] represent a new potential treatment option for a wide spectrum of conditions from muscle wasting diseases (from age-related to AIDS or cancer-related), but is also has immense potential for muscle building for Bodybuilders, fitness, athletes and an agent to minimize atrophy during recovery periods from serious surgery or similar situations."

119. However, the FDA has previously concluded that similar products containing Ostarine "present significant potential safety risks to consumers who take them without the supervision of a practitioner licensed by law to administer such drugs." Thus, DNA's "Ostarine" product is not recognized among experts as safe and effective for use under the conditions suggested by Defendant and may pose significant health and safety risks to consumers.

120. Indeed, medical experts have opined that products containing SARMs "have many recognized potential serious side effects, including hepatoxicity (liver damage),

and markedly lower plasma HDL cholesterol (raising the risk of heart disease)," and may have even more serious consequences that are currently unknown.  In fact, since Ostarine is only in phase II clinical trials, medical experts have emphasized that there is "<u>no evidence that Ostarine is safe for humans to consume</u>."  Thus, medical experts have concluded that the sale of products containing SARMs, like Defendant's "Ostarine" product, is "highly dangerous to public safety."

121.   Defendant also fails to disclose that SARMs, like its "Ostarine" product, are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, despite the fact that Defendant markets its products to body builders and other competitive athletes.

122.   The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers in California into believing that they are purchasing a product with different characteristics.

123.   The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the consequences of taking steroids or illegal substances.

124.   Defendant has introduced its false and misleading statements into California via marketing and advertising on various websites and shipment of its product containing false and misleading advertising into California.

125.   Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to DNA and the loss of goodwill in Plaintiff's products.  Indeed, DNA's conduct is a black eye on the industry as a whole, and has the tendency to disparage Plaintiff's products and goodwill.

126.   Defendant's actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in California which, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of their

products in violation of the False Advertising Law at Business & Professions Code §
17500, *et seq*.

## SIXTH CLAIM FOR RELIEF

### (False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act)
### (Against Defendant DNA)

127.   Plaintiff incorporates the allegations contained in the foregoing paragraphs
as though fully set forth herein in their entirety.

128.   Defendant has purposely made false and misleading statements that
"Ostarine" has numerous purported benefits, including but not limited to, "great for
strength," "great for lean mass gains," "great for body recomposition," "great for
endurance," and has "joint healing abilities."  Defendant also claims that its "Ostarine"
product "Increases Lean Muscle Mass, "Increases Strength & Endurance, "Promotes Fat
Loss," "Promotes Recovery," and even "Increases Libido."  Moreover, Defendant
promises consumers all of these benefits from using its "Ostarine" product, with no side
effects.  For example, Defendant claims, "in essence, SARMs such as Ostarine causes
muscle growth in the same manner as steroids, however unlike testosterone and other
anabolic steroids and prohormones, SARMs (as nonsteroidal agents) don't produce the
growth effect on prostate and other secondary sexual organs."  Furthermore, Defendant
claims that "not only does [Ostarine] represent a new potential treatment option for a
wide spectrum of conditions from muscle wasting diseases (from age-related to AIDS or
cancer-related), but is also has immense potential for muscle building for Bodybuilders,
fitness, athletes and an agent to minimize atrophy during recovery periods from serious
surgery or similar situations."

129.   Indeed, medical experts have opined that products containing SARMs "have
many recognized potential serious side effects, including hepatoxicity (liver damage),
and markedly lower plasma HDL cholesterol (raising the risk of heart disease)," and may
have even more serious consequences that are currently unknown.  In fact, since Ostarine

is only in phase II clinical trials, medical experts have emphasized that there is "no evidence that Ostarine is safe for humans to consume." Thus, medical experts have concluded that the sale of products containing SARMs, like Defendant's "Ostarine" product, is "highly dangerous to public safety."

130.   Defendant also fails to disclose that SARMs, like its "Ostarine" product, are specifically prohibited for use in sporting events by the World Anti-Doping Agency and the U.S. Anti-Doping Agency, despite the fact that Defendant markets its products to body builders and other competitive athletes.

131.   The use of such falsely marketed substances has the tendency to deceive a substantial segment of the public and consumers, including those in this forum, into believing that they are purchasing a product with different characteristics.

132.   The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer is concerned about the consequences of taking steroids or illegal substances.

133.   Defendants have introduced their false and misleading statements into interstate commerce via marketing and advertising on various websites and shipment of their products into interstate commerce containing false and misleading advertising.

134.   Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to Defendants and the loss of goodwill in Plaintiff's products. Indeed, Defendants' conduct is a black eye on the industry as a whole, and has the tendency to disparage Plaintiff's products and goodwill.

135.   Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of its products in violation of Section 43(a)(1)(B) of the Lanham Act.

## SEVENTH CLAIM FOR RELIEF

### (Violation of RICO)

(Against all Defendants)

136.  Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

137.  Under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301(g)(1) the term "drug" includes (1) any articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, and (2) articles (other than food) intended to affect the structure or any function of the body of man or other animals.

138.  The introduction or delivery for introduction into interstate commerce of any misbranded drug is prohibited 21 U.S.C. § 331(a).  Misbranding encompasses dispensing without a prescription a drug intended for use by which, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug."  21 U.S.C. § 353(b)(1).  A drug is also misbranded where its labeling was false or misleading in any particular (§ 352(a)), where its labeling does not bear adequate directions for use (§ 352(f)(1)), or where the drug was manufactured, prepared, propagated, compounded or processed in an establishment not registered with the Secretary of Health and Human Services (§ 352(o)).  The introduction or delivery for introduction into interstate commerce of a misbranded drug is a felony.  (§ 333(a)(2)).

139.  Under the FDCA, 21 U.S.C. § 201(g)(1) the term "drug" includes any articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals, and articles (other than food) intended to affect the structure or any function of the body of man or other animals.  Although Defendant has falsely advertised and misbranded its Ostarine Product as "intended for laboratory and research use only" and "NOT FOR HUMAN CONSUMPTION," its product is actually a "drug" as defined by section 201(g)(1) of the FDCA [21 U.S.C. § 321(g)(1)], because it is intended to cure, mitigate, treat, or prevent disease conditions and affect the structure

and function of the body.  The intended use of a product may be determined by, among other things, its labeling claims, advertising, and circumstances surrounding its distribution.  *See* 21 C.F.R § 201.128.

140.  SARMS are drugs and cannot be dispensed for human use without a prescription from a licensed medical practitioner.

141.  There is an illegitimate market for SARMs among body builders and others who engage in weight training, since it is believed that the use of these substances enhance muscle development.

142.  Defendants are engaged in a comprehensive scheme to obtain money and property by means of the false and fraudulent pretenses, representations and promises, detailed above, including the illicit sale of SARMs.

143.  Illegal distribution of SARMs is facilitated by use of the Internet, including the websites www.furiousnutrition.com and www.thednaanabolics.com (the "Sites").  Consumers purchase SARMs through the Sites and the orders are fulfilled by either Defendant Legacy or DNA Distribution.  Defendants Aliperto, Mason, Gosai, and Goldstein, as Members of Furious and DNA control this scheme and, on information and belief, are the individuals who profit directly from Defendants illicit sale of SARMS.  Defendants have knowingly sold the above drugs to be delivered by commercial interstate carrier.

144.  Defendants have violated the substantive RICO statute, 18 U.S.C.A. § 1962 as detailed above by receiving income from a pattern of racketeering activity engaging in interstate commerce.  Defendants have conspired among themselves to engage in the above activity.

145.  Plaintiff has been injured in his business or property by reason of the Conspiracy Defendants violation of section 1962 by, *inter alia*, the diversion of sales to Defendants site, which sells products directly in competition with Plaintiff's products.

/ / /

/ / /

/ / /

## **PRAYER**

Wherefore, Plaintiff Nutrition Distribution LLC prays for judgment against Defendants as follows:

1.  For preliminary and permanent injunctive relief enjoining Defendants from producing, licensing, marketing, and selling products containing Ostarine and/or other Selective Androgen Receptor Modulators ("SARMs");

2.  For an award of compensatory damages to be proven at trial in accordance with 15 U.S.C. § 1117;

3.      For an award of any and all of Defendants' profits arising from the foregoing acts in accordance with 15 U.S.C. § 1117 and other applicable laws;

4.      For restitution of Defendants' ill-gotten gains pursuant to Cal. Bus. & Prof. Code § 17200 et. al.;

5.      For treble damages in accordance with 15 U.S.C. § 1117;

6.      For punitive damages;

7.      For costs and attorneys' fees; and

8.      Any other relief the Court may deem appropriate.

DATED:  December 18, 2015                TAULER SMITH LLP


                                         By:  ___/s/ Robert Tauler_____
                                              Robert Tauler
                                              NUTRITION DISTRIBUTION LLC

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED:  December 18, 2015                    TAULER SMITH LLP


By:    /s/ Robert Tauler
       Robert Tauler
       NUTRITION DISTRIBUTION LLC